**In the matter of the EXTRADITION OF Paul Garza MATHISON, a/k/a Brian Jake Parsons.**

Civ. No. 3:12–mj–00143–1.

United States District Court, D. Oregon.

Sept. 25, 2013.

---

Ryan W. Bounds, U.S. Attorney's Office, Portland, OR, for USA.

Cozette T. Tran–Caffee, Robert R. Calo, Lane Powell, PC, Kristen L. Tranetzki, Portland, OR, for Paul Garza Mathison also known as Brian Jake Parsons.

## OPINION AND CERTIFICATE OF EXTRADITABILITY

JOHN V. ACOSTA, United States Magistrate Judge.

### Introduction

The United States of America, on behalf of the Government of Mexico, seeks the extradition of Paul Garza Mathison, a/k/a Brian Parsons ("Mathison"), under the 1978 Extradition Treaty between the United States of America and the United Mexican States. Mathison is accused of having committed crimes of fraud in Mexico between March and May of 2009, for which a Mexican court, in October 2009, issued a warrant authorizing his arrest. Mathison opposes the United States' extradition request and separately moves to stay this court's ruling on the extradition request to allow him to pursue challenges to the Mexican warrant in a Mexican court.

The court finds that the Government has satisfied its burden under 18 U.S.C. § 3184 et seq., and established that Mathison is eligible to be extradited to Mexico, and that Mathison has failed to meet his burden to obtain a stay of this court's ruling on the Government's extradition request pending the outcome of Mathison's challenge in the Mexican courts.[1]

*Background*

Mathison is an American citizen wanted in Mexico for allegedly having engaged in conduct constituting fraud under Article 324, section III of the Criminal Code of the State of Michoacan, Mexico. Mathison's alleged fraudulent conduct occurred during March, April, and May 2009. During this time period Mathison allegedly posed as the owner of a company called "Promotora Turistica de Uruapan" and induced Jose Jesus Begar Ortiz ("Ortiz"), a Mexican citizen, to loan Mathison money against five checks drawn against that company's bank accounts; one of the accounts did not actually exist and the others lacked sufficient funds to cover the checks Mathison wrote. By this scheme Mathison obtained from Ortiz 2,810,000 Mexican pesos, the equivalent of $235,374, as well as a BMW automobile. On October 9, 2009, after completion of a criminal investigation by the Investigative Public Prosecutor in the Judicial District of Urapan, State of Michoacan, Mexican United States, the Second Criminal Trial Court for the Judicial District of Urapan issued a warrant issued for Mathison's arrest.

On September 14, 2012, the Government filed a complaint against Mathison in which it detailed the Mexican government's request for Mathison's extradition pursuant to the Extradition Treaty between the United States of America and the United Mexican States of May 4, 1978 (TIAS 9656) ("Treaty"), and seeking a warrant for Mathison's arrest. At the time, Mathison was in custody at Columbia River Correctional Institution, Oregon, serving consecutive 13–month sentences for felony car theft and identity theft. In the complaint the Government asked the court to certify to the Secretary of State that the Mexican government's evidence is sufficient under the Treaty to sustain the charges against Mathison and support his extradition. The arrest warrant issued and the Government arrested Mathison on October 1, 2012.

On December 12, 2012, the Government filed its memorandum (Dkt. No. 9) in support of its extradition request,[2] accompanied by supporting exhibits (Dkt. Nos. 10–15). At Mathison's unopposed request, the court continued the extradition hearing scheduled for December 19, 2012. On March 27, 2013, Mathison filed his opposition memorandum (Dkt. No. 20) to the Government's extradition request and separately moved to continue the extradition hearing set for April 3, 2013. The court granted that motion over the Government's objection and reset the extradition hearing for May 30, 2013. On May 17, 2013, Mathison filed his Motion (Dkt. No. 29) to Refrain from Ruling and subsequently he filed his supporting exhibits

---

1. United States Magistrate Judges may hear and determinate extradition matters when "authorized so to do by a court of the United States." 18 U.S.C. § 3184. Magistrate judges in the District of Oregon "are authorized to perform all of the duties and functions prescribed and authorized by 28 U.S.C. 636 and any other statutes or Federal Rules of Procedure which authorize a Magistrate

Judge to perform judicial duties or functions." Standing Order 07–mc–9207 (D. Oregon September 7, 2007).

2. The Government's formal extradition request is contained in its complaint (Dkt. No. 1). It did not file a separate motion to extradite.

(Dkt. Nos. 31–36, 47). On May 21, 2013, the court continued the extradition hearing set for May 30, 2013, to allow Mathison to submit supplemental evidence regarding his *amparo* proceeding. The court reset the hearing to July 16, 2013, and on that date the hearing convened and proceeded. In the interval, Mathison filed his *amparo* proceeding in the Mexican courts on July 15, 2013.

*The Government's Evidence*

The Government submitted the following evidence in support of its extradition request:

1. November 21, 2012, Declaration of Julie B. Martin, State Department Attorney Advisor ("Martin Decl."). (Dkt. No. 9–1, Page ID # 25–27).

2. Government of Mexico Extradition Request. (Martin Decl., Ex. 1; Dkt. No. 9–1; Page ID # 28–39 (Spanish) and # 40–49 (English)).

3. Extradition Treaty between United States and Mexico. (Martin Decl., Ex. 1; Dkt. No. 9–1; Page ID # 50–71.)

4. November 13, 2012, Certification of Documentary Evidence by United States Ambassador to Mexico Earl Anthony Wayne ("Wayne Cert."). (Dkt. No. 10; Page ID # 72.)

5. November 13, 2012, Affidavit of Ricardo Cachoúa Garza, translator. (Dkt. No. 10; Page ID # 73.)

6. October 12, 2012, Affidavit of Haydee Chavez Sanchez, Agent of the Office of Public Prosecutor, General Division of International Proceedings, Office of the Assistant Attorney General for Legal and International Affairs of the Office of the Attorney General of the Republic ("Sanchez Aff."). (Dkt. No. 10; Page ID # 74–91.)

7. Articles of the Michoacan Criminal Code. (Sanchez Aff., Ex. 1; Dkt. No. 10; Page ID # 92–96.)

8. October 9, 2009, Decision to Issue Arrest and Detention Warrant. (Sanchez Aff., Ex. 2; Dkt. No. 10; Page ID # 97–115.)

9. March 19, 2010, Certification of Maria Ines Manriquez Garcia, Public Prosecutor, Second Criminal Trial Court, Michoacan Judicial District, regarding statute of limitations applicable to the crime of fraud. (Sanchez Aff., Ex. 3; Page ID # 116–117.)

10. May 13, 2009, Statement of Leonel Meza Gomez, LLB, Legal Representative of and on behalf of Jose Jesus Bejar Ortiz. (Sanchez Aff., Ex. 4; Dkt. No. 10, Page ID # 118–122.)

11. April 24, 2009, Purchase and Sale Agreement for Real Property between Alicia Romero Bedolla, seller, and Paul Garza Mathison, buyer. (Sanchez Aff., Ex. 5; Dkt. No. 11, Page ID # 123–127.)

12. April 13, 2009, Automobile Bill of Sale between Jose Jesus Bejar Ortiz, seller, and Paul Garza Mathison, buyer. (Sanchez Aff., Ex 6; Dkt. No. 11, Page ID # 128–130.)

13. Copies of bank checks and bank records, certified on May 13, 2009, by Victor Luna Beltran, First Agent of the Investigative Public Prosecutor, Michoacan Judicial District. (Sanchez Aff., Ex. 7; Dkt. No. 11, Page ID # 131–135.)

14. Ratification of the written accusation filed by Leonel Meza Gomez. (Sanchez Aff., Ex. 8; Dkt. No. 11, Page ID # 136–137.)

15. June 1, 2009, Statement of Jose Manuel Bejar Cuara, son of Jose Jesus Bejar Ortiz, (Sanchez Aff., Ex. 9; Dkt. No. 11, Page ID # 138–142.)

16. June 1, 2009, Statement of Marco Antonio Sanchez Aguilar, business associate of Paul Garza Mathison and Jose Jesus Bejar Ortiz, (Sanchez Aff., Ex. 10; Dkt. No. 11, Page ID # 143–147.)

17. June 1, 2009, Statement of Clemente Rodriguez Ramirez, Jose Jesus Bejar Ortiz's driver. (Sanchez Aff., Ex. 11; Dkt. No. 12, Page ID # 148–154.)

18. July 8, 2009, Statement of Juan Carlos Corza Carrillo, Banco del Bajio bank manager. (Sanchez Aff., Ex. 12; Dkt. No. 12, Page ID # 155–157.)

19. August 26, 2009, Additional Statement of Leonel Meza Gomez. (Sanchez Aff., Ex. 13; Dkt. No. 12, Page ID # 158–160.)

20. August 30, 2009, Investigation Completion letter by Eduardo Medina Mendoza and Hector Cortes Aguilar, Office of the Attorney General, State of Michoacan. (Sanchez Aff., Ex. 14; Dkt. No. 12, 161–164.)

21. Expert Accounting Opinion of Salvador Castañon Morales attesting to the amount of financial loss alleged to have been caused by Paul Garza Mathison. (Sanchez Aff., Ex. 15; Dkt. No, 12, Page ID # 165–169.)

22. Bank records from Banco Satander and Scotiabank Inverlat. (Sanchez Aff. Ex. 16; Dkt. No. 12, Page ID # 170–181.)

23. Photo array used by Jose Jesus Bejar Ortiz and Clemente Rodriguez Ramirez to identify Paul Garza Mathison. (Sanchez Aff. Ex. 17.; Dkt. No. 12, Page ID # 182–188.)

24. October 10, 2012, Certified copy of arrest warrant and supporting documents in the original Spanish, by Haydee Chavez Sanchez, Agent of the Office of Public Prosecutor, General Division of International Proceedings, Office of the Assistant Attorney General for Legal and International Affairs of the Office of the Attorney General of the Republic.

(Sanchez Aff., Ex. 18; Dkt. No. 13, Page ID # 189–294.)

*Mathison's Evidence*

Mathison submitted the following evidence in opposition to the Government's extradition request and in support of his motion to defer ruling on the extradition request:

1. May 20, 2013, Amended Declaration of Cozette Tran–Caffee in Support of Motion to Refrain from Ruling ("May 20, 2013, Tran–Caffee Decl.") (Dkt. No. 34), Exhibits A through D.

2. May 30, 2013, Letter of Kristen Tranetzki with preliminary Legal Opinion of Francisco Javier Paz Rodriguez, Mexican attorney for Paul Garza Mathison, attached to July 9, 2013, Declaration of Cozette Tran–Caffee in Support of Reply on Motion to Refrain From Ruling (Dkt. No. 47), Exhibit 1 (Dkt. No., 47–1).

3. July 15, 2013, letter from Robert Calo with Notification of *Amparo* Action Filed by Francisco Javier Paz Rodriguez, Mexican attorney for Paul Garza Mathison.[3]

4. July 31, 2013, letter from Robert Calo with July 29, 2013, statement of Brenda Ortiz–Ruiz, and July 31, 2013, Declaration of Brian Jake Parsons a/k/a Paul Garza Mathison.

5. August 8, 2013, letter from Robert Calo with undated Declaration of Maria Vasquez, and July 20, 2013, Declaration of George Ibarra Martinez.

*Mathison's Amparo Proceeding*

Mathison's Mexican counsel filed his *amparo* proceeding on July 15, 2013. "*Amparo*" means "protection" in the

**3.** Mathison's counsel filed some evidence in the court file and submitted other evidence to the court by letter. Letters and attachments

not filed in the court file are attached and filed with this Opinion and Order.

Spanish language, *United States v. Fowlie,* 24 F.3d 1059, 1064 (9th Cir.1994), and is a proceeding created under the Mexican Constitution to protect individuals against state abuses by empowering Mexican federal courts to review government action. It is a "highly complex legal institution" that is somewhat similar to *habeas corpus* in United States law, and is the procedural vehicle used to "review and annul unconstitutional judicial decisions." *Id.* An individual may use an *amparo* proceeding to invalidate the infringing official act, or render it without effect on the grounds of unconstitutionality or illegality. (May 20, 2013, Tran–Caffee Decl., Ex. C, pp. 1–2.) The validity of an arrest warrant may be challenged in an *amparo* action. (May 20, 2013, Tran–Caffee Decl., ¶ 11.)

By his *amparo* action Mathison challenges the validity of the Mexican warrant on these grounds:

1. The cashier checks referred to in the arrest warrant were issued on a guaranty basis. Thus, there was no exchange of assets or goods as part of the original transactions.

2. There is not sufficient proof, such as Mathison's authenticated signature on the cashier's checks, that Mathison drew the checks at issue.

3. There is no evidence of the claimed economic loss. The victim, Ortiz, never filed copies either of his banking accounts or of a receivable signed by Mr. Parsons. Consequently, the opinion of the expert accountant is incomplete because it lacks financial information.

4. The expert accountant's loss calculation was not based on proper proof of loss, such as documented amounts of withdrawals from Ortiz's accounts. Thus, the calculation is inadequate.

5. The arrest warrant never refers to the existence of the two documents issued by the Mexican SEC (Comisión Nacional de Valores) in regard to the "titularity" of the defendant's company banking accounts. Thus, it is unclear why the documents are cited in the diplomatic note.

6. There is no evidence of actual transfer of title and possession of the vehicle which Mathison allegedly bought from Ortiz.

7. Some formalities of a criminal complaint are missing here. These include the power of attorney Ortiz granted to Leonel Meza Gomez.

8. It is unusual that Ortiz did not make a personal statement before the prosecutor. Instead, he conveyed his information through his attorney, Gomez.

9. Mathison was not summoned to defend himself against the fraud charges before the arrest warrant was issued.

Opposition to Request for Extradition ("Opp. Memo.") at 7; May 30, 2013, Letter of Kristen Tranetzki with preliminary Legal Opinion of Francisco Javier Paz Rodriguez, Mexican attorney for Paul Garza Mathison, pp. 1–2.

*Standards*

*I. Request for Extradition*

Extradition from the United States is a diplomatic process initiated by a request from a foreign nation directly to the State Department seeking extradition of an individual. *Prasoprat v. Benov,* 421 F.3d 1009, 1012 (9th Cir.2005). The process is governed by 18 U.S.C. § 3184, which provides in relevant part:

Whenever there is a treaty or convention for extradition between the United States and any foreign government ... any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States ... may, upon complaint made under oath, charging any person found

within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention ... issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered.

\* \* \*

If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention ... he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

Thus, the State Department determines whether the requesting nation's request is within the scope of a treaty between the requesting nation and the United States and, if so, then a United States Attorney files a complaint in federal district court to obtain an arrest warrant for the fugitive. *Manta v. Chertoff,* 518 F.3d 1134, 1140 (9th Cir.2008). Upon such a complaint, a district judge or magistrate judge convenes an extradition hearing to determine whether:

1. the court has jurisdiction to conduct the extradition proceeding;

2. the court has jurisdiction over the fugitive;

3. there is an extradition treaty in full force and effect;

4. the crimes charged by the requesting nation fall within the terms of the treaty; and

5. competent legal evidence to support a finding of extraditability.

*Id.* *See also In re Extradition of McCabe,* Case No. 10–XR–90622 NJV, 2011 WL 723561, at \*10 (N.D.Cal. Feb. 22, 2011) (listing the five elements and characterizing the fifth element as "there is probable cause to believe that the fugitive committed the crimes"), citing *Zanazanian v. United States,* 729 F.2d 624, 625–26 (9th Cir.1984). If the court concludes that each of the above elements are met, it has no discretion and must certify the extradition to the Secretary of State. 18 U.S.C. § 3184; *Manta,* 518 F.3d at 1140. The Secretary of State "then determines in her discretion whether the individual will be surrendered." *Prasoprat,* 421 F.3d at 1012.

The admissibility of evidence in an extradition proceeding is governed by " 'the general extradition law of the United States and the provisions of the Extradition Treaty.' " *In re Extradition of Santos,* 795 F.Supp.2d 966, 970 (C.D.Cal.2011), quoting *Emami v. U.S. District Court,* 834 F.2d 1444, 1450 (9th Cir.1987). The Government's evidence must be "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof of the same[.]" 18 U.S.C. § 3190. Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply in extradition hearings. Fed.R.Crim.P. 1(a)(5)(A); Fed.R.Evid. 1101(d)(3) (but preserving the rules of privilege); *In re Santos,* 795 F.Supp.2d at 970, citing *Then v. Melendez,* 92 F.3d 851,

855 (9th Cir.1996). Thus, hearsay evidence and unsigned or unsworn translations of witness statements, for example, are admissible to support probable cause for the charges against the fugitive, *Then,* 92 F.3d at 855; *In re Santos,* 795 F.Supp.2d at 970–71, and the district court's determination need not even be based upon evidence that would be admissible at a preliminary hearing or in a grand jury proceeding in the United States. *Zanazanian v. United States,* 729 F.2d at 626, citing *Collins v. Loisel,* 259 U.S. 309, 317, 42 S.Ct. 469, 66 L.Ed. 956 (1922).

 " 'Extradition treaties are to be liberally construed so as to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses.' " *In re Santos,* 795 F.Supp.2d at 970, quoting *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 14, 57 S.Ct. 100, 81 L.Ed. 5 (1936). "These treaties should be faithfully observed, and interpreted with a view to fulfill our just obligations to other powers, without sacrificing the legal or constitutional rights of the accused." *In re Extradition of Basic,* Case No. 5:11–MJ–5002–REW, 2012 WL 3067466, at *18 (E.D.Ky. July 27, 2012), quoting *Grin v. Shine,* 187 U.S. 181, 184, 23 S.Ct. 98, 47 L.Ed. 130 (1902). Thus, an extradition treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor v. Laubenheimer,* 290 U.S. 276, 298, 54 S.Ct. 191, 78 L.Ed. 315 (1933).

## II. Motion for Stay

 The test to obtain a stay requires the court to consider four factors:

(1) whether the moving party has made a strong showing that is likely to succeed on the merits;

(2) whether the moving party will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies.

*Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). *Accord Leiva–Perez v. Holder,* 640 F.3d 962, 964 (9th Cir.2011). A stay is an exercise of judicial discretion and the party requesting the stay bears the burden of showing that the circumstances of the particular case justify the court exercising its discretion. *Nken,* 556 U.S. at 433–34, 129 S.Ct. 1749.

 The first two factors of the test "are the most critical," *Nken v. Holder,* 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009), but a stay cannot issue unless the moving party meets its burden on the second factor, irreparable harm. *Leiva–Perez,* 640 F.3d at 965 (characterizing irreparable harm as "the bedrock requirement" to obtaining a stay). This is true "regardless of [the moving party's] proof regarding the other stay factors." *Id.* The moving party's evidence must prove that irreparable harm "is probable if the stay is not granted." *Id.* at 968. A showing of a " 'possibility of irreparable injury' fails to satisfy the second factor," *Nken,* 556 U.S. at 434–35, 129 S.Ct. 1749, quoting *Abbassi v. INS,* 143 F.3d 513, 514 (9th Cir.1998). Further, the moving party must show that the irreparable harm is "specific to his or her case, as opposed to a reason that would apply equally well to all [others] in all cases." *Leiva–Perez,* 640 F.3d at 969.

## Discussion

### I. Motion for Stay

 Mathison opposes the Government's extradition request and also counters it with his own motion asking the court to refrain from ruling on that re-

quest pending the outcome of his *amparo* proceeding. To be clear, Mathison does not ask the court to stay implementation of a certification order should it find 18 U.S.C. § 3184's requirements are met. What Mathison asks Page is that the court make *no* decision on the Government's extradition request until his *amparo* proceeding concludes or, alternatively, a reasonable period of time elapses. Mathison's "request to refrain from ruling" is in essence a motion for a stay because it seeks to obtain a stay's essential function: an order that "operates upon the judicial proceeding itself . . . by halting or postponing some portion of the proceeding[.]" *Nken,* 556 U.S. at 428, 129 S.Ct. 1749, citing Black's Law Dictionary 1413 (6th ed.1990) (defining a "stay" as "a suspension of the case or some designated proceedings within it"). As such, Mathison's request is governed by the four-part test applicable to stay motions.[4]

Mathison offers two reasons he will suffer irreparable harm if the court denies his stay motion, but each reason fails to support his irreparable harm argument. Mathison's first reason comprises two fact-based contentions. First he contends that if extradited to Mexico he will be subject to the physical abuse or torture reportedly commonplace in the Mexican prison system. Second he asserts that his life will be in danger if he is sent to Mexico because he has received threats from persons in Mexico, such threats presumably a result of Mathison's allegedly fraudulent actions.

▪ Each of Mathison's two fact-based contentions fails, although for different reasons. His first fact-based reason, physical abuse or torture by Mexican authorities, fails to demonstrate individualized

harm. Mathison must provide "a reason specific to his or her case, as opposed to a reason that would apply equally well to all [others] and all cases[,]" that he is likely to suffer harm. *Leiva–Perez,* 640 F.3d at 969. However, Mathison fails to link the reported abuse in the Mexican prison system to his particular situation; instead, his apprehensions about the Mexican prison system are generalized and are not specific to him or to his case. Thus, this factual contention does not satisfy the Ninth's Circuit's threshold requirement for demonstrating irreparable harm,

Mathison's second factual contention, that he has received threats, also fails to meet the irreparable harm standard, Mathison asserts extradition to Mexico will endanger his life because the Mexican criminal charges are based on financial transactions involving drug cartel members and their money-laundering operations. At the July 16, 2013, hearing Mathison's counsel proffered that Mathison had received two threats, one approximately eight months earlier that "people were hunting for him" in Mexico, and the second approximately five months earlier that he should not return to Mexico because there is a "100,000 peso price on his head," After the hearing Mathison filed a letter from Brenda Ortiz–Ruiz, declarations from Maria Vasquez and George Ibarra Martinez, and his own declaration, all of which claim that Mathison's life will be in danger if he is returned to Mexico.

Mathison's evidence of threats does not satisfy his irreparable harm burden, First, the evidence proffered at hearing and contained in the subsequently filed letters and declarations is not of threats but of warnings. Others telling Mathison that "people

---

**4.** The Government acknowledged at hearing that the court has authority under its inherent powers to stay, or refrain from, making its decision on the Government's request for extradition.

are hunting" for him and that there is a "price on [his] head" in Mexico, that there is cartel influence and official corruption in the government, and similar statements, are cautionary in nature, not specific threats to do Mathison harm made by identified persons or groups.

Second, Mathison has submitted no evidence that links his allegedly fraudulent transactions with drug cartels or money laundering, None of his witnesses assert that Ortiz, the victim of Mathison's alleged fraud, or any of the persons who gave statements or evidence in support of the Mexican charges are involved in the drug trade or money laundering. Mathison's declaration contains a single sentence to this effect but that sentence is general and conclusory. Moreover, Mathison gives no explanation for why these persons with whom he previously dealt without incident now want to do him harm.

Third, the reliability and accuracy of the statement and declarations are questionable. Mathison's declaration and the statements from Vasquez and Martinez are based on information each obtained from unidentified persons, ultimately making impossible any objective and accurate assessment of each witness's personal knowledge and credibility, and thus the validity and seriousness of the threats. The letter from Ortiz–Ruiz also is based on information from a third party (her brother) but contains only general assertions of drug cartel violence and official corruption. None of Mathison's three witnesses claims to have heard any person make a threat against Mathison, and Mathison himself does not claim to have received a threat from anyone who states an intent to harm him.

■ Fourth, all of Mathison's evidence on this point is provided by him or by persons he identified as witnesses, and Mathison's credibility is suspect. First, he has a record of convictions for crimes involving dishonesty [5]; second, he is strongly motivated to avoid extradition to face criminal charges in a foreign country; and third, and he chose at hearing to not testify himself about the alleged threats, Federal Rule of Evidence 609(a)(2) recognizes the relevance to credibility of the first reason, and the court cannot overlook the effect on credibility of the latter two reasons, *See In re Extradition of McCabe,* 2011 WL 723561, at *15 (N.D.Cal. Feb. 22, 2011)(" 'The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate.' "), quoting *Quinn v. Robinson,* 783 F.2d 776, 815 (9th Cir.1986).

The nature and content of the evidence supporting the *Leiva–Perez* court's finding of irreparable harm underscores the inadequacy of Mathison's evidence here. First, Leiva–Perez, who sought political asylum in the United States, testified personally. Second, the district court found him credible. Third, his testimony described specific acts and identified specific groups:

> Leiva–Perez testified … that he was personally targeted for extortion and savage beatings by a particular group of individuals affiliated with the Farabundo Marti National Liberation Front ("FMLN"), a political party. These actions, if carried out after removal, would certainly constitute irreparable harm. Leiva–Perez's testimony indicated that the extortion and beating are indeed likely to recur if he is forced to return to El Salvador.

640 F.3d at 970. Mathison's evidence contains none of the indicators of credibility or

**5.** At the time the Government filed the complaint in this case, Mathison was in state custody serving consecutive sentences for felony car theft and identity theft.

specificity that distinguished Leiva–Perez's testimony. In sum, individually or taken together Mathison's factual contentions do not compel a finding that irreparable harm is probable if his stay motion is denied.

Mathison's second argument is that he will suffer legal irreparable harm if a stay is not granted. He contends that denying the stay will irreparably harm him because he then will be extradited to Mexico, and under Mexican law once he is extradited to and arrested in Mexico, his "judicial status" changes. Specifically, his arrest in Mexico would cancel the warrant and it would cease to exist, and the *amaparo* action then also would cease to exist. Consequently, Mathison argues, he would be denied the right and opportunity to challenge the warrant under Mexican law, To support his position, Mathison cites a district court opinion from *In re Extradition of Daniel Wepplo*, Case No. 09–MC–53, 2010 WL 1433407 (N.D.Ohio April 7, 2010), where the court found this possible outcome sufficient to constitute irreparable harm and thus justify a delay of the court's ruling on the government's extradition request.

Mathison's use of *Wepplo* to support his legal irreparable harm argument is misplaced for reasons that also support a finding that this argument fails to meet his irreparable harm burden. The *Wepplo* court's stay decision turned on Wepplo's strong showing that the Mexican warrant's probable cause was based on fabricated testimony.[6] Wepplo brought his *amparo* proceeding to challenge the probable cause underlying the Mexican warrant and he sought a stay of the extradition court's decision while he pursued his challenge in Mexico. Probable cause is a prerequisite to the district court certifying extraditability under 18 U.S.C. § 3184. *See also McCabe*, 2011 WL 723561, at *10 (noting the court must find "probable cause to believe that the fugitive has committed the charged crimes" as a prerequisite to certifying extraditability under the statute). Wepplo used his *amparo* proceeding to demonstrate by a direct challenge to the legitimacy of the supporting evidence serious doubt whether probable cause existed Accordingly, the *Wepplo* court refrained from ruling on the government's extradition request pending the outcome of Wepplo's *amparo* proceeding.

Mathison's *amparo* proceeding does not challenge the probable cause underlying the Mexican warrant in his case. Instead, it identifies a variety of procedural and technical deficiencies in the warrant. Mathison observes that:

1. The cashier checks referred to in the arrest warrant were issued on a guaranty basis. Thus, there was no exchange of assets or goods as part of the original transactions.

2. There is not sufficient proof, such as Mathison's authenticated signature on the cashier's checks, that Mathison drew the checks at issue.

3. There is no evidence of the claimed economic loss. The victim, Ortiz, never filed copies either of his banking accounts or of a receivable signed by Mr. Parsons. Consequently, the opinion of the expert accountant is incomplete because it lacks financial information.

4. The expert accountant's loss calculation was not based on proper proof of loss, such as documented amounts of withdrawals from Ortiz's accounts. Thus, the calculation is inadequate.

---

6. The court's April 7, 2010, opinion granting Wepplo a stay relied on and incorporated by reference its earlier opinion granting Wepplo's release pending the extradition hearing, in which the facts of the case were extensively described. (*In re Extradition of Daniel Wepplo*, Case No. 09–MC–53, Docket No. 13 (N.D.Ohio July 8, 2009)).

5. The arrest warrant never refers to the existence of the two documents issued by the Mexican SEC (Comisión Nacional de Valores) in regard to the "titularity" of the defendant's company banking accounts. Thus, it is unclear why the documents are cited in the diplomatic note.

6. There is no evidence of actual transfer of title and possession of the vehicle which Mathison allegedly bought from Ortiz

7. Some formalities of a criminal complaint are missing here. These include the power of attorney Ortiz granted to Leonel Meza Gomez.

8. It is unusual that Ortiz did not make a personal statement before the prosecutor. Instead, he conveyed his information through his attorney, Gomez.

9. Mathison was not summoned to defend himself against the fraud charges before the arrest warrant was issued.

Opp. Memo. at 7; May 30, 2013, Letter of Kristen Tranetzki with preliminary Legal Opinion of Francisco Javier Paz Rodriguez, Mexican attorney for Paul Garza Mathison, pp. 1–2.

None of the deficiencies Mathison raises challenges the substance of the witness statements and documents that provide the probable cause for the charges against him. In his *amparo* proceeding Wepplo claimed the witness testimony that provided the probable cause to issue the warrant had been fabricated. Mathison asserts in his *amparo* proceeding no similar attack against the testimony of the lay witnesses, the accounting expert, or the attorneys; or against the bank records, the real property bill of sale, or the automobile bill of sale. In short, Mathison's *amparo* proceeding challenges the Mexican warrant's compliance with technical or procedural requirements of Mexican law but leaves intact the content of the witness testimony that iden-

tifies him and describes his conduct, as well as the content of the documentary evidence that memorializes the transactions, that serve as the basis of the Mexican fraud charges. Thus, if Mathison's *amparo* proceeding is successful it would not, unlike Wepplo's *amparo* proceeding, affect the court's ability to fulfill its role in determining whether probable cause exists to believe Mathison has committed the crime charged. Because the court's probable cause determination is not affected by the outcome of Mathison's *amparo* proceeding, there is no reason to stay the court's ruling on the government's extradition request. *See Skaftouros v. United States*, 667 F.3d 144, 156 (2nd Cir.2011) ("Technical objections to the demanding nation's compliance with its own law are particularly disfavored [in the extradition context]").

The court addressed the effect of a similar procedural challenge on an extradition request in *In re Extradition of Basic*, 2012 WL 3067466 (E.D.Ky. July 27, 2012). There, Basic argued the extradition request did not comply with the treaty governing extradition requests between the United States and Bosnia & Herzegovina ("BiH") because no warrant document had been submitted. The court first observed that "no document in the BiH packet bears the formal title 'warrant of arrest.'" *Id.* at *17. The court then acknowledged that under the BiH treaty "the Secretary of State cannot extradite citizen Basic unless BiH produces a duly-authenticated warrant copy." *Id.* at *18.

The court found that BiH's papers nonetheless satisfied the treaty's warrant requirement. *Id.* The court reiterated longstanding Supreme Court precedent that "comity-based deference and liberal construction rules [are] required" in the extradition context. *Id.*, citing *Grin v. Shine*, 187 U.S. at 185, 23 S.Ct. 98 ("[W]here the

proceeding is manifestly taken in good faith, a technical noncompliance with some formality of criminal procedure should not be allowed to stand in the way of a faithful discharge of our obligations."). The *Basic* court then cited *Skaftouros v. United States*, 667 F.3d 144 (2nd Cir.2011), where the court of appeals reconfirmed the liberal construction principle and "the requirement that 'extradition judges should avoid making determinations regarding foreign law.'" *In re Basic*, 2012 WL 3067466, at *18, quoting *Skaftouros*, 667 F.3d at 156. Again relying on the Second Circuit's *Skaftouros* decision, the *Basic* court noted that in assessing whether the warrant requirement is satisfied, it required

> only a document, properly authenticated, showing "that the fugitive is *currently charged* with an offense recognized by the treaty. It must, in other words, show that the fugitive is in fact 'prosecutable' upon extradition to the demanding country." ... A valid warrant thus is a document indicating a current local procedural basis of a crime within the relevant treaty. The BiH papers meet this standard under the proper rubric.

*In re Basic*, 2012 WL 3067466, at *18 (citations omitted; emphasis in original).

The Mexican government's papers indisputably establish that Mathison is currently charged with conduct which, if true, violated Mexican criminal fraud laws. His *amparo* proceeding alleges procedural infirmities in the Mexican warrant which, even if proved, would not alter that Mathison is accused by competent evidence of having engaged in conduct that defrauded a Mexican citizen of substantial amounts of money, which conduct constitutes prosecutable crimes that fall within the extradition treaty between the United States and Mexico. Furthermore, Mathison's *amparo* proceeding does not dispute what the Mex-

ican witnesses and documents show: that he was involved in the transactions described and memorialized, that he is the subject of the fraud charges, and that he is the person identified in the Mexican government's extradition request.

Mathison frames the procedural infirmities as irreparable harm by arguing, as he did at the July 16, 2013, hearing, that he will lose his right under the Mexican Constitution to raise these challenges if he is extradited and the Mexican warrant is then executed. *See also* Extradition Opp. Mem. at 5–8. Mathison's argument does not affect the court's irreparable harm analysis because the question he raises, whether he surrenders his right to raise these challenges if extradited, is solely a question of Mexican constitutional law. Such questions are the very kind of foreign law determinations that extradition judges are to avoid. This is especially true of Mathison's attack on the warrant's validity on the ground that he did not have the opportunity afforded under Mexican law to defend himself against the fraud charges before the warrant issued. An American extradition court is neither equipped nor empowered to interpret and apply the Mexican Constitution or to determine what rights it bestows upon individuals charged with violating Mexican criminal laws. *See Skaftouros*, 667 F.3d at 156 (noting that it is error for United States courts to review whether "the demanding country has complied with its own law" except as necessary to "ensure compliance with the applicable extradition treaty"); *In re Basic*, 2012 WL 3067466, at *19 ("This Court is ill-equipped to parse Bosnian or Republika Srpska practice for the fine technical points on the topic of warrant issuance.").

Mathison's only challenge to the substance of the evidence itself at most creates only a credibility issue that also must be resolved by the Mexican courts. Ma-

thison claims the witness statements are "dubious" because one of the witnesses is Ortiz's son, Ortiz did not provide a sworn statement to the Mexican authorities, and the transactions described in the witnesses' statements "are not fraudulent." (Extradition Opp. Mem. at 16–17.) That a statement is from the family member of a victim does not automatically disqualify or even undermine its use as probable cause, and Mathison provides no authority for his contention that it should. Furthermore, Mathison cites no authority under United States or Mexican law that the victim of a crime must always provide a sworn statement before that statement may be used to support probable cause. Finally, Mathison's claim that the subject transactions were not fraudulent but instead were loans based handled in civil court is a legal argument that raises a question of Mexican law best left for determination by the Mexican courts.

In summary, the difference between Mathison's *amparo* proceeding and Wepplo's *amparo* proceeding is critical because Mathison's *amparo* proceeding, unlike Wepplo's *amparo* proceeding, does not call into question the probable cause offered in support of the Mexican warrant, the presence of which is a prerequisite to this court's certification decision under the statute. Mathison's *amparo* challenges instead questions whether the Mexican authorities have complied with that country's law, which is a question requiring the determination of foreign law in which extradition judges must not engage. Accordingly, Mathison's legal argument does not demonstrate irreparable harm and his Motion (Dkt. No. 29) to Refrain from Ruling is DENIED.

## II. Request for Extradition

Having concluded that a stay of the Government's extradition request is not warranted, the court examines whether the Government's extradition request meets the certification requirements established under the governing statutory and case law authority.

### A. Court's Jurisdiction to Conduct Extradition Proceeding.

This court possesses subject matter jurisdiction to conduct extradition proceedings pursuant to 18 U.S.C. § 3184. Mathison agreed that this court has jurisdiction to conduct this extradition proceeding.

### B. Jurisdiction Over Mathison.

This court possesses personal jurisdiction over Mathison, who at all times material was present and in state custody in the District of Oregon, In addition, Mathison agreed at the July 16, 2013, hearing that the court has personal jurisdiction over him for purposes of the Government's extradition request.

### C. Valid Extradition Treaty.

A valid extradition treaty between the United States and Mexico exists and is, and has been at all material times, in full force and effect. *See* Extradition Treaty between United States and Mexico, Martin Decl., Ex. 1; Dkt. No. 9–1; Page ID # 50–71. In addition, Mathison agreed at the July 16, 2013, hearing that an valid extradition treaty between the two countries is in effect.

### D. The Mexican Criminal Charge Is Within the Scope of the Treaty.

First, the Mexican government has charged Mathison with an extraditable crime under the Treaty, Mathison is charged with fraud, as described in Article 324(III) of the Penal Code of the State of Michoacan. *See* Articles of the Michoacán Criminal Code, Sanchez Aff., Ex. 1; Dkt. No. 10; Page ID # 92–96. Under the

Treaty "extradition shall take place ... for wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year." *See* Extradition Treaty between United States and Mexico, Art. II(1), Martin Decl., Ex. 1; Dkt. No. 9–1; Page ID # 55, Fraud is one of the acts specifically identified in the Appendix to the Treaty (*id.* at App. ¶ 8, Page ID # 69).

 Second, the fraud charged here is meets the "dual criminality" requirement for extradition because the essential character of the Mexican fraud also is criminalized conduct in the United States. "Under the principle of dual criminality, no offense is extraditable unless it describes conduct which is criminal in both jurisdictions." *Emami v. U.S. Dist. Court for N.D. Cal.,* 834 F.2d 1444, 1449 (9th Cir.1987). *See also In re Extradition of McCabe,* No. 10–XR–90622 NJV, 2011 WL 723561, at *10 (N.D.Cal. Feb. 22, 2011) ("Dual criminality exists when the offense charged in the country seeking extradition 'is generally recognized as criminal in both countries.' ") (quoting *Factor v. Laubenheimer,* 290 U.S. 276, 300, 54 S.Ct. 191, 78 L.Ed. 315 (1933)). The name and elements of the crime in the two countries need not be the same, nor must the scope of criminal liability be coextensive. *Emami,* 834 F.2d at 1444 (citations omitted). "Rather, dual criminality exists if the essential character of the acts criminalized by the law of each country are the same." *Oen Yin–Choy v. Robinson,* 858 F.2d 1400, 1404 (9th Cir. 1988) (internal quotations and citations omitted). The foreign offense may be one constituting a crime under federal law or under the law of the state in which the extradition hearing is held. *Cucuzzella v. Keliikoa,* 638 F.2d 105, 107–08 (9th Cir. 1981).

Mathison is charged with fraud, defined under the Michoacan Criminal Code to have occurred when "[w]hoever by means of deceit or taking advantage of a mistaken belief held by another person, illegally obtains, for themselves or a third party, an object or an unlawful profit commits the crime of fraud." *See* Articles of the Michoacan Criminal Code, Sanchez Aff., Ex. 1; Dkt. No. 10; Page ID # 93, The Michoacan Criminal Code also imposes a term of imprisonment of between three and twelve years for fraud. *Id.* The essential character of this crime is using deceit toward or creating a mistaken belief in another person for the purpose of obtaining from that person an object or profit. To support dual criminality the Government cites 18 U.S.C. § 1343, entitled "Fraud by wire, radio, or television," and which provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

Mathison observes that the Mexican fraud statute contains no requirement that the accused person have engaged in the proscribed conduct using electronic means and that he is not alleged in the Mexican warrant to have used such means. This argument is premised on a comparison of each statute's elements rather than essential character of the conduct each proscribes. The gravamen of the Mexican charge is employing deceit or false impression to take from another person money or

an item of value. The United States statute similarly turns on the accused person having obtained money or an item of value from another by using false or fraudulent representations or pretenses. Both statutes prohibit theft or stealing by deception or false statements. That the United States statute includes the means by which the fraud is accomplished, use of the mails, does not affect that the essential character of the proscribed conduct is the same as the conduct prohibited under the Mexican statute. The Ninth Circuit, as well as other circuits, has considered the relationship of mail fraud to foreign crimes for extradition purposes and has held that the use of the mails need not be an element in the foreign crime for dual criminality to be satisfied. *Emami*, 834 F.2d at 1450 (holding that mail-fraud statute supports dual criminality despite fact that foreign statute "does not contain the jurisdictional element of a use of the mails"). In fact, the Treaty accounts for such differences, as it provides that dual criminality shall not be defeated "[w]hen, for the purpose of granting jurisdiction to the United States government . . . the use of the mail or other means of carrying out interstate or foreign commerce, is also an element of the offense." Treaty, Art. 2(4), Martin Decl., Ex. 1; Dkt. No. 9–1; Page ID # 55–56. Finally, because both the Mexican statute and the United States statute impose a maximum penalty well in excess of one year's imprisonment, the Treaty's prerequisite that "the laws of both Contracting Parties [punish the alleged conduct] by deprivation of liberty the maximum of which shall not be less than one year," is satisfied.[7]

Accordingly, the crime charged falls within the scope of the Treaty and meets the dual criminality requirement.

*E. Probable Cause.*

■■■ "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir.2007) (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). Probable cause means a "fair probability," not certainty or even a preponderance of the evidence. *United States v. Gourde,* 440 F.3d 1065, 1069–71 (9th Cir.2006) (en banc). " 'The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.' " *Rodis v. City, County of San Francisco,* 558 F.3d 964, 969 (9th Cir.2009), quoting *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). In making a probable cause determination the district court does not weigh conflicting evidence or make factual determinations, but instead decides only whether there is competent evidence to support probable cause for the charged offense. *In re McCabe,* 2011 WL 723561, at *14. "Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *Mainero v. Gregg,* 164 F.3d 1199, 1207 n. 7 (9th Cir. 1999), *superseded by statute on other grounds, Cornejo–Barreto v. Seifert,* 218 F.3d 1004 (9th Cir.2000), citing *Charlton v. Kelly,* 229 U.S. 447, 457–58, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Barapind v. Eno-*

---

**7.** Because the court had determined that the United States statute satisfies the dual criminality requirement it need not determine whether the Oregon state statutes the Government cites in the alternative satisfy the requirement.

*moto,* 400 F.3d 744, 749 (9th Cir.2005) (same). It is "solely with the province" of the district court to assess the credibility of the witnesses presented at the extradition hearing and determines the weight to be given their testimony. *In re McCabe,* 2011 WL 723561, at *15, citing *Quinn v. Robinson,* 783 F.2d 776, 815 (9th Cir.1986).

 The Government's evidence satisfies the probable cause standard because it supports the conclusion of a fair probability Mathison engaged in the alleged conduct which constitutes the crime of fraud under the Michoacan Criminal Code. Accompanying the Mexican warrant are witness statements, bank records, a bill of sale for an automobile, a contract for the sale of real property, an expert accountant's report, and a photo array, all of which corroborate the allegations contained in the Mexican warrant. The witness statements each are given under oath and provide detailed descriptions of some part of the conduct which collectively give rise to the fraud charge. (Sanchez Aff., Ex. 4; Dkt. No. 10, Page ID # 118–122; Ex. 8; Dkt. No. 11, Page ID # 136–137; Ex. 9; Dkt. No. 11, Page ID # 138–142; Ex. 10; Dkt. No. 11, Page ID # 143–147; Ex. 11; Dkt. No. 12, Page ID # 148–154; Ex. 12; Dkt. No. 12, Page ID # 155–157; and Ex 13; Dkt. No. 12, Page ID # 158–160.) Four of the five statements are based on the witnesses' personal knowledge of one or more of the transactions described in the warrant, including the physical transfer of cash from Ortiz to Mathison. The remaining statement, Ortiz's, was given through his legal representative on his behalf but provides similar detail about the underlying events. The statements uniformly identify Mathison as the person involved in the transactions in which Mathison represented his solvency to Ortiz and promise to repay the amounts Ortiz loaned to him, which result-ed in Ortiz giving to Mathison the amounts of money and the automobile which are the subject of the fraud charge. The circumstances described in the witness statements also support the inference that Mathison intentionally made statements either to deceive Ortiz or to create in him mistaken beliefs, for the purpose of causing Ortiz to give Mathison both money and the automobile.

The witness testimony is supported by the documentary evidence that accompanies the warrant. The bank records are certified. (Sanchez Aff. Ex. 7, Dkt. No. 11, Page ID # 131–135, and Ex. 16, Dkt. No. 12, Page ID # 170–181.) There are copies of the checks Mathison issued to Ortiz and attestations from various banks that the accounts or funds against which the checks were drawn did not exist, (*Id.*) A purchase and sale agreement for real property, although not consummated, corroborates that Mathison was engaging in financial transactions with Ortiz consistent with the other conduct alleged in the warrant. (Sanchez Aff., Dkt. No. 10, Page ID # 81, 85, and Ex. 5; Dkt. No. 11, Page ID # 123–127.) The parties signed the contract before a notary and one of the witnesses. (*Id.*) Ortiz and a witness were shown a six-person photo array that contained one photo of Mathison, and both witnesses identified Mathison as the person involved in the transactions with Ortiz. (Sanchez Aff. Ex. 17, Dkt. No. 12, Page ID # 182–188.) The expert accountant's report confirms the total amount which Mathison by his alleged fraud obtained from Ortiz. (Sanchez Aff., Ex. 15; Dkt. No. 12, Page ID # 165–169.) Mathison in fact received delivery of Ortiz's BMW automobile pursuant to the bill of sale that also accompanies the warrant. (Sanchez Aff., Dkt. No. 10, Page ID # 84–85, and Ex 6; Dkt. No. 11, Page ID # 128–130.)

Mathison made no evidentiary showing in his briefs or at the July 16, 2013, hearing to explain away this evidence or to obliterate the probable cause the evidence creates. Those challenges he did offer—that some witnesses are related to or work for the victim, for example—at best go only to the credibility of those witnesses' testimony. That other evidence disputes some of the evidence supporting probable cause does not prevent the court from finding probable cause exists to support the Mexican warrant, just as it would not prevent the court from finding probable cause exists to support the warrant request submitted by a United States law enforcement agency. Accordingly, the court concludes that the Mexican warrant is supported by evidence that creates probable cause to believe that Mathison committed the crime of fraud under Mexican law.

### F. Authentication

The Treaty provides that the documents required to be submitted in support of the Mexican government's extradition request "shall be received in evidence" when those documents "are certified by the principle [sic] diplomatic or consular officer of the United States of America." Treaty, Article 10(6)(b). *See also* 18 U.S.C. 3190 (requiring admission of evidence in an extradition proceeding that is "properly and legally authenticated"). There is no dispute here that the United States' principal diplomatic officer in Mexico, Ambassador Earl Anthony Wayne, certified the evidence submitted by the Government in support of the extradition request. The Government presented the appropriate diplomatic certification (*see* Wayne Cert., Dkt. No. 10; Page ID # 72), and Mathison agreed at the July 16, 2013, hearing that the Government's evidence met the certification requirement.

### C. Mathison's Defenses

Generally, the Secretary of State, and not the district court, makes the determination whether extradition should be denied because of fears the fugitive will be tortured or not treated humanely. *Lopez–Smith v. Hood,* 121 F.3d 1322, 1327 (9th Cir.1997). Mathison stated at hearing that he is not asserting a political crime defense to the Mexican warrant, *see Matter of Extradition of McMullen,* 989 F.2d 603, 613 (2nd Cir.1993) ("Whether or not to include a 'political offense' exception in an extradition treaty is a policy judgment, which rests exclusively in the discretion of the Executive Branch and the Senate."), and he preserved his "humanitarian exception" argument to raise on petition for habeas corpus or with the Secretary of State should that be necessary. *See In re Extradition of Santos,* 795 F.Supp.2d 966, 991–92 (C.D.Cal.2011) (discussing the rule of non-inquiry and the Ninth Circuit's rejection of a humanitarian exception to extradition); and *Prasoprat v. Benov,* 421 F.3d 1009, 1017 (9th Cir.2005) (holding that an extradition magistrate does not have the authority to refuse to issue certificate of extradition on humanitarian grounds).

### Certificate of Extraditability

JOHN V. ACOSTA, United States Magistrate Judge.

Having heard and considered the evidence and arguments in this matter, in accordance with 18 U.S.C. § 3184 et seq., and based on the findings and conclusions set forth above, the court certifies to the Secretary of State of the United States of America that:

1. This court has subject matter jurisdiction over extradition proceedings and is authorized to conduct extradition proceedings.

2. This court has personal jurisdiction over Paul Garza Mathison, a/k/a Brian Jake Parsons.

3. A valid extradition treaty exists between the Mexican United States and the United States of America, and that Treaty is in full force and effect.

4. The crime charged by the Mexican government is an extraditable crime under the Treaty.

5. The Mexican government has produced competent evidence creating probable cause to support a finding that Mathison is extraditable.

6. The Mexican government's evidence is properly authenticated by the principal diplomatic or consular officer of the United States of America to the Mexican United States.

Accordingly, Paul Garza Mathison, a/k/a Brian Jake Parsons, is extraditable to Mexico for the offense of criminal fraud described in the Government's extradition request.